**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**YAZEN DIDES**

**Plaintiff,**

**CASE NO._______________**

**vs.**

**FOX ROTHSCHILD LLP**

**Defendant.**

_______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**COMES NOW,** Plaintiff, Yazen Dides (hereinafter "Plaintiff"), by and through his undersigned counsel, hereby files this action against the above-named Defendant, Fox Rothschild LLP, and alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action against Defendant for disability discrimination, failure to provide reasonable accommodation, and retaliation in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. ("ADA"), the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760.01 et seq. ("FCRA"), and unjust enrichment. Plaintiff seeks all legal and equitable relief available under the ADA, FCRA, and unjust enrichment, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**THE PARTIES**

*The Plaintiff*

2. Plaintiff Yazen Dides (hereinafter "Plaintiff") was employed by Fox Rothschild LLP ("Defendant") from January 18, 2024, through September 5, 2025, as Counsel in

Defendant's Corporate Department and Healthcare Transactions practice group, based in Defendant's Sarasota, Florida, office.

3. At all times material to this action, Plaintiff was a qualified individual with a disability and an employee within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10.
4. At all times during his employment with Defendant, Plaintiff was a resident of Sarasota County, Florida.

*The Defendant*

5. Defendant Fox Rothschild LLP is a Pennsylvania limited liability partnership operating a national law firm with offices throughout the United States, including an office in Sarasota County, Florida.
6. At all times material to this action, Defendant employed fifteen (15) or more employees and was an employer within the meaning of the ADA, 42 U.S.C. § 12111(5), and the FCRA, Fla. Stat. § 760.02(7).
7. Defendant employed Plaintiff in its Sarasota, Florida, office and controlled the terms and conditions of Plaintiff's employment.

## **JURISDICTION AND VENUE**

8. This is an action for damages and equitable relief by Plaintiff against his former employer, Defendant Fox Rothschild LLP, for violations of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 et seq., the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. §§ 760.01 et seq and unjust enrichment.
9. This Court has subject matter jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10. This Court has supplemental jurisdiction over Plaintiff's FCRA and unjust enrichment claims pursuant to 28 U.S.C. § 1367.

11. Venue lies within the United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 1.04(a) of the Middle District of Florida because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Sarasota County, Florida, where Plaintiff was employed by Defendant in its Sarasota office.

12. At all times relevant hereto, Plaintiff resided in Sarasota County, Florida, and was employed by Defendant in Sarasota County, Florida.

## CONDITIONS PRECEDENT

13. All conditions precedent to bringing this action have occurred, have been performed, or have been satisfied.

14. On or about October 15, 2025, Plaintiff timely filed a Charge of Discrimination and Retaliation with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 511-2026-00173, against Defendant Fox Rothschild LLP, alleging disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 et seq. and the Florida Civil Rights Act of 1992, as amended.

15. Plaintiff's Charge was dual-filed with the Florida Commission on Human Relations ("FCHR") for purposes of Plaintiff's claims under the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01 et seq.

16. More than one hundred eighty (180) days have elapsed since Plaintiff filed his Charge, and the FCHR did not issue a determination of reasonable cause within that period.

17. On June 10, 2026, the EEOC issued its Determination and Notice of Rights, dismissing Plaintiff's Charge and notifying Plaintiff of his right to institute a civil action against Defendant within ninety (90) days of receipt of the Notice.

18. Plaintiff commenced this action within ninety (90) days of receipt of the EEOC's Determination and Notice of Rights.

19. Accordingly, Plaintiff has exhausted his administrative remedies and satisfied all conditions precedent to bringing his claims under the ADA and FCRA.

## **FACTUAL BACKGROUND**

*Plaintiff's Employment and Strong Performance*

20. Throughout his employment, Plaintiff maintained a strong record of productivity, client development, and revenue generation.

21. Plaintiff began working for Defendant on or about January 18, 2024, as Counsel, a partner-track position, in Defendant's Corporate Department and Healthcare Transactions practice group in Sarasota, Florida.

22. During Defendant's fiscal year ("FY") 2025 (April 1, 2024 – March 31, 2025), Plaintiff billed approximately 2,320 hours (with a time value of $1,202,860), generated more than 870,000 in working-attorney fees at a standard realization rate of approximately 90%, and carried approximately $244,000 in additional accounts receivable.

23. Plaintiff's billable hours performance substantially exceeded Defendant's applicable expectations and compared favorably with attorneys at the partnership level.

24. Plaintiff's strong performance continued into FY 2026 (beginning April 1, 2025).

25. Within the first three months of Defendant’s FY 2026 (April 1, 2025 – June 30, 2025), Plaintiff generated and collected more origination revenue than he had during the entirety of FY 2025 (approx. $147,000).

26. During FY 2025, Plaintiff was included and began participating in Fox’s mandatory partner-track training programs, and the Defendant confirmed to him that he was on course for partnership consideration in FY 2026 (April 1, 2025 – March 31, 2026).

27. Around the end of April 2025, Plaintiff was invited to and attended Defendant's 2025 Fiscal Year-End Financial Performance Meeting for Partners.

28. Financial and performance information available to Plaintiff reflected that his working-attorney fee collections exceeded those of approximately one-third of Defendant's existing equity partners.

29. For FY 2025 (April 1, 2024-March 31, 2025), Plaintiff billed approximately 1,000 more hours than the average equity partner.

30. Consistent with Plaintiff’s continued record of productivity, client development, and revenue generation in fiscal year 2026, in or about July 2025, Defendant’s Business Development & Marketing team contacted Plaintiff to inform him that the Firm intended to submit his name for Chambers USA recognition in Florida Healthcare.

31. During the entirety of his employment with Defendant, Plaintiff was never issued a written disciplinary warning, given a negative performance review or evaluation, or placed on a performance improvement plan, whether formally or informally.

*Plaintiff Requests a Reasonable Accommodation for His Hearing Disability*

32. Plaintiff has a hearing impairment that substantially limits his ability to hear and affects professional communications central to his work as an attorney, including meetings,

telephone and video conferences, negotiations, and communications with clients and colleagues.

33. In or about the spring of May 2024, Plaintiff first inquired about receiving an accommodation for his hearing impairment.

34. In August 2024, Defendant's Human Resources Department became involved in Plaintiff's request for an accommodation.

35. Defendant thereafter required Plaintiff to obtain medical documentation concerning his limitations and accommodation needs.

36. In September 2024, Plaintiff submitted the requested accommodation documentation and continued to communicate with Defendant regarding assistive technology that would enable him to communicate effectively in the workplace.

37. Defendant provided Plaintiff with an external Jabra speaker.

38. The speaker did not effectively accommodate Plaintiff's hearing limitations.

39. On December 27, 2024, Plaintiff advised Human Resources that, after consulting with his audiologist, the viable accommodations included new hearing aids and a higher-end portable speaker.

40. Plaintiff specifically advised Defendant that his existing hearing aids were approximately four years old and that new hearing aids were necessary to improve his hearing capacity.

41. Defendant thereafter ordered another external speaker for Plaintiff.

42. That device also failed to effectively accommodate Plaintiff's hearing limitations.

43. On April 7, 2025, Plaintiff again notified Human Resources that the device Defendant had provided was "*still not working for me at all.*"

44. Plaintiff again informed Defendant that his medical provider recommended new hearing aids together with an upgraded portable speaker.

45. Plaintiff provided additional medical and accommodation documentation and continued asking Defendant to provide an effective accommodation.

46. On April 12, 2025, Plaintiff again expressly requested that Defendant provide and pay for the hearing aids recommended in connection with his disability.

47. On or about April 16, 2025, Plaintiff participated in a conference call with Human Resources concerning his continuing request for hearing aids and the need for an effective alternative if Defendant would not provide them.

48. Plaintiff thereafter continued to communicate with Human Resources and to identify potential devices that might assist him.

49. Plaintiff repeatedly explained that the devices already attempted had not effectively accommodated his disability.

50. On May 2, 2025, Human Resources denied Plaintiff's request that Defendant provide hearing aids, characterizing hearing aids as personal-use devices and directing Plaintiff to Defendant's benefits program through which he could purchase hearing aids himself.

51. Defendant's response did not resolve Plaintiff's need for an effective workplace accommodation.

52. Plaintiff immediately objected to Defendant's handling of his request and asked Human Resources:

"*Please advise how your email accommodates me to perform essential communication during work hours?*"

53. Plaintiff further complained that Defendant had failed to meaningfully engage with him regarding an effective alternative after the devices already attempted had failed.

54. Plaintiff expressly told Human Resources:

"*I need help. This has been dragged on for months. I need to be able to do a very critical component of my job description (effective communication).*"

55. Plaintiff continued seeking a solution and proposed the Bang & Olufsen Cisco 950 earbuds as another potential accommodation while he appealed the denial of the hearing aids.

56. On May 5 and May 6, 2025, Plaintiff again challenged Defendant's handling of his accommodation request and requested that Defendant conduct an individualized assessment based upon his disability, his job functions, and his medical provider's recommendations.

57. Plaintiff specifically advised Defendant:

"*In my case, hearing aids are required for me to perform essential job functions, and my audiologist's recommendation is specific to the work context.*"

*Plaintiff Complains About Defendant's Failure to Accommodate Him, and Julie Paul Becomes Involved*

58. By May 2025, Plaintiff had repeatedly complained that Defendant had failed to provide an effective reasonable accommodation for his hearing disability.

59. On May 6, 2025, Human Resources Manager Keshia Green escalated Plaintiff's complaint to Defendant's Chief Human Resources Officer, Julie Paul ("Ms. Paul").

60. Ms. Green informed Plaintiff:

"*I have forwarded your email to Julie Paul, Chief Human Resources Officer. She will reach out to you directly.*"

61. From that point forward, Ms. Paul became personally involved in Plaintiff's accommodation dispute.

62. On May 7, 2025, Ms. Paul responded directly to Plaintiff and maintained Defendant's refusal to provide the requested hearing aids.

63. Ms. Paul characterized hearing aids as personal-use items excluded from reasonable accommodation and directed Plaintiff toward Defendant's benefits program so that Plaintiff could purchase the hearing aids himself.

64. In Plaintiff's May 7, 2025, email response to Ms. Paul, Plaintiff clarified that his concern was not Defendant's refusal to purchase his preferred device but Defendant's blanket denial without proposing any alternative accommodations or guidance. Plaintiff continued explaining to Ms. Paul that Defendant had failed to provide an effective accommodation that permitted Plaintiff to perform the essential communication functions of his position.

65. Plaintiff continued requesting that Defendant reconsider its position and engage in an individualized assessment of his accommodation needs.

66. After Plaintiff repeatedly challenged Defendant's handling of his accommodation request, Ms. Paul maintained Defendant's position and became increasingly adversarial toward him.

*Julie Paul's Hostile and Retaliatory Treatment of Plaintiff*

67. On or about May 21, 2025, Plaintiff met by Microsoft Teams video conference with Ms. Paul regarding his continuing request for an effective accommodation.

68. During the meeting, Ms. Paul told Plaintiff that *"*the buck stops with me.*"*

69. During the meeting, Ms. Paul dismissed Plaintiff's concerns, disputed his understanding of Defendant's accommodation obligations, and challenged his position regarding the need for an effective accommodation.

70. Ms. Paul talked down to and yelled at Plaintiff while he attempted to explain why the accommodations Defendant had provided were ineffective and why he continued to seek assistance from Human Resources.

71. Plaintiff nevertheless continued attempting to resolve the accommodation issue and agreed to try alternative devices.

72. Defendant had agreed on May 7, 2025, to provide the Bang & Olufsen earbuds Plaintiff had identified. Following the May 21 meeting, Defendant also agreed to provide the Cisco Desk Mini that Plaintiff had identified on April 22, 2025.

73. Problems and delays nevertheless continued with Defendant's provision of those accommodations, including Defendant's admittedly "inadvertent" order, on or about May 15, 2025, of a third Jabra speaker instead of the Cisco Desk Mini.

74. On or about June 2, 2025, a package was delivered to Defendant's Sarasota office intended for Plaintiff.

75. Plaintiff received another Jabra speaker (750MS Speakerphone) but received neither the Bang & Olufsen earbuds nor the Cisco Desk Mini that Defendant had agreed to provide.

76. On June 16, 2025, Plaintiff notified Ms. Paul via email that he had not yet received the earbuds and that Defendant had delivered the wrong speaker.

77. Ms. Paul responded in writing that Defendant had confirmation that the headphones were delivered to Plaintiff's office and that Plaintiff's report that he had not received them was "not credible."
78. Plaintiff continued emphasizing in email correspondence that he had not received the earbuds.
79. Ms. Paul nevertheless continued to question Plaintiff's truthfulness and insisted that the headphones had been delivered.
80. During the ensuing dispute, Ms. Paul accused Plaintiff of being untruthful about receiving the accommodation equipment.
81. Plaintiff objected to Ms. Paul's treatment of him and questioned why the accommodation process, which was supposed to be cooperative, had become so adversarial.
82. Plaintiff continued maintaining that he had not received the earbuds until leaving for scheduled holiday travel on June 22, 2025, at which time he was still subject to Ms. Paul's ongoing hostility and accusations.
83. On July 11, after returning from travel scheduled for July 6, Plaintiff again emailed Ms. Paul to request an update on the Cisco Desk Mini and to reiterate that he had not received the Bang & Olufsen earbuds.
84. On or around July 14, Ms. Paul initiated a FedEx tracer concerning the earbuds.
85. Defendant ultimately could not locate the earbuds through the requested FedEx tracer.
86. On July 22, 2025, Ms. Paul advised Plaintiff that Defendant would order a pair of Bang & Olufsen earbuds.

87. After Ms. Paul questioned Plaintiff's credibility regarding the missing earbuds, Defendant's FedEx tracer failed to locate them, and Defendant ordered a replacement pair.

88. Ms. Paul did not retract her accusation that Plaintiff's report was "not credible."

89. Nor did Ms. Paul apologize for accusing Plaintiff of dishonesty and questioning his credibility before verifying whether the earbuds had actually been delivered.

90. By this point, Ms. Paul, the Defendant's Chief Human Resources Officer and the official responsible for Plaintiff's accommodation request, had questioned Plaintiff's honesty more than once after he challenged Defendant's handling of his accommodation.

*Julie Paul Takes Control of the Investigation of Plaintiff*

91. Around early August 2025, approximately three months after Ms. Paul's May 7, 2025, email stating that the earbuds would be ordered that day, Plaintiff finally received the Bang & Olufsen earbuds.

92. On August 8, 2025, Ms. Paul emailed Plaintiff a same-day WebEx invitation for an "*important discussion.*"

93. In his reply, Plaintiff asked to meet early the following week and advised that the replacement earbuds he had received the prior week *"have been great to date."*

94. The meeting ultimately took place on August 13, 2025, via WebEx with Plaintiff, Ms. Paul, and Sarasota Office Managing Partner Robert Stroud, who was physically present in the room with Plaintiff.

95. By that meeting, Ms. Paul had already personally participated in the equipment dispute concerning Plaintiff's accommodation, challenged his legal position regarding

Defendant's accommodation obligations, and accused Plaintiff of being untruthful and making a report that was "not credible."

96. Despite her prior involvement in Plaintiff's accommodation dispute and her challenges to his credibility, Ms. Paul assumed the central role in investigating the allegations against him. Before the meeting, she provided Plaintiff with no notice of its subject matter, context, or basis.

97. Ms. Paul opened the meeting by presenting allegations concerning a dog-sitting arrangement involving a summer associate, without first advising Plaintiff of the allegations or providing him an opportunity to prepare a response

98. Ms. Paul repeatedly characterized the matter as an "*abuse of power,*" a "*power imbalance,"* and "*intimidation*".

99. Ms. Paul accused Plaintiff of using his supervisory position to force the summer associate to dog-sit for him while he was on vacation.

100. Plaintiff denied coercing or forcing the summer associate to dog-sit and asked Ms. Paul to clarify the basis for her allegations, including the statement whether he had treated the summer associate "like a slave."

101. Plaintiff explained that the summer associate had offered to dog-sit in exchange for payment.

102. Plaintiff further explained that the contemplated arrangement involved $1,000 for two weeks of dog-sitting, with another individual watching the dogs during the first week and the summer associate during the second week.

103. Plaintiff further explained that he paid the summer associate $800 for the one-week period during which she watched the dogs.

104. At the end of the meeting, Ms. Paul asked Mr. Stroud whether he had any additional comments regarding the matter. Mr. Stroud then explained that the summer associate had alleged that Plaintiff's performance evaluation of her was retaliatory.

105. Plaintiff denied retaliating against the summer associate and explained that his evaluation reflected his assessment of her work.

106. Importantly, Plaintiff had completed the evaluation before learning that the summer associate had made any complaint concerning the dog-sitting arrangement.

107. Plaintiff's evaluation included both favorable and constructive feedback about the summer associate's work.

108. Plaintiff had also highly recommended the summer associate for permanent employment with Defendant and even threw a goodbye lunch party on the summer associate’s last day.

109. Defendant subsequently offered the summer associate permanent employment in its Sarasota office, which she accepted.

110. Plaintiff denied that he had attempted to interfere with the summer associate's employment and explained that he had, in fact, supported her permanent employment with Defendant.

111. During the investigation, Plaintiff identified individuals he believed had firsthand information about the dog-sitting arrangement.

112. Plaintiff also expressed concern regarding Ms. Paul's involvement in investigating his credibility given her treatment of Plaintiff during the preceding accommodation dispute.

*Julie Paul Again Accuses Plaintiff of Dishonesty During Her Investigation*

113. Following the August 13 meeting, Ms. Paul requested communications relating to the dog-sitting arrangement.

114. Plaintiff agreed to provide the materials in his possession.

115. Plaintiff thereafter provided Ms. Paul with communications in his possession, including group text messages and internal Firm communications concerning his interactions with the summer associate.

116. Plaintiff informed Ms. Paul that he could not locate a separate one-on-one text thread and nevertheless provided the other responsive communications in his possession.

117. Plaintiff further proposed that Ms. Paul obtain any additional messages directly from the summer associate and provide them to Plaintiff so that he could verify and respond to their contents.

118. Rather than accepting Plaintiff's production at face value or asking neutrally whether additional communications existed, Ms. Paul again attacked Plaintiff's credibility.

119. Ms. Paul responded that:

*"it appears this conversation is missing some messages."*

120. This was the second time within approximately two months that Ms. Paul personally questioned Plaintiff's truthfulness or credibility when addressing his reasonable accommodation.

121. The first statement concerned Plaintiff’s report that he had not received his accommodation device; Defendant’s subsequent tracer failed to locate the package.

122. The second occurred while Ms. Paul was investigating Plaintiff and was concerned about Plaintiff's production of communications.

123. Plaintiff immediately responded that he had provided all responsive communications in his possession, including information that Human Resources had not specifically requested.

124. Plaintiff asked Ms. Paul to identify what she believed was missing.

125. Plaintiff again proposed that Defendant obtain any additional communications directly from the summer associate so that Plaintiff could review and respond to them.

126. Ms. Paul did not identify any particular message that Plaintiff supposedly withheld.

127. Plaintiff requested a follow-up meeting to better understand and respond to the allegations against him.

128. Although a further meeting was discussed, no substantive follow-up investigative meeting with Plaintiff occurred before his termination.

129. Plaintiff continued attempting to participate in the investigation.

130. On or about August 19 or 20, 2025, Plaintiff again followed up with Ms. Paul.

131. Ms. Paul advised Plaintiff that she was out of the office and would address the matter upon her return.

132. On August 27, 2025, Plaintiff sent Ms. Paul a detailed written response setting forth his position concerning the summer-associate allegations.

133. Plaintiff again denied compelling the summer associate to provide personal assistance.

134. Plaintiff explained his position concerning the dog-sitting arrangement, payment, and performance evaluation.

135. Plaintiff further emphasized that his evaluation was based on documented work-related examples and denied that personal matters influenced it.

136. Plaintiff advised Ms. Paul that he had contemporaneous communications corroborating his position and asked whether Human Resources required anything further from him.

137. Ms. Paul did not substantively respond to Plaintiff's August 27 written submission before Defendant terminated his employment.

*Defendant Advertises a Sarasota Position While Julie Paul's Investigation Is Pending*

138. On or about August 27, 2025, the same day Plaintiff submitted his detailed written response to Ms. Paul, Defendant publicly advertised a position titled "Corporate (Health Care Regulatory) Associate - Sarasota."

139. At that time, Plaintiff remained employed, and the posting sought an attorney for a position substantially similar to Plaintiff's role.

140. The posting specifically identified Defendant's Sarasota office and sought an attorney practicing in substantially the same healthcare/corporate practice area in which Plaintiff worked.

141. Defendant later revised or reposted the position to identify additional office locations only after Plaintiff brought it to their attention.

142. Defendant's Sarasota-specific posting therefore appeared before Plaintiff was notified of his termination and while the investigation involving Ms. Paul remained pending.

*Defendant Terminates Plaintiff*

143. On September 2, 2025, Plaintiff was directed to participate in a meeting with Ms. Paul and Mr. Stroud.

144. During that meeting, Defendant informed Plaintiff that it was terminating his employment.

145. Ms. Paul, the same Chief Human Resources Officer who became personally involved after Plaintiff challenged Defendant's accommodation practices, who accused Plaintiff's accommodation report of being "not credible," and who thereafter questioned whether Plaintiff withheld communications during her investigation, participated directly in Plaintiff's termination meeting.

146. Plaintiff challenged Ms. Paul's participation, requested that different Human Resources personnel handle the matter, and objected that her involvement in investigating his credibility created a conflict given her treatment of him during the accommodation dispute. Ms. Paul declined to leave the meeting or recuse herself.

147. Defendant nevertheless proceeded with the termination.

148. By letter dated September 3, 2025, Defendant confirmed that Plaintiff's termination would become effective September 5, 2025.

149. Defendant identified several purported reasons for terminating Plaintiff, including the summer-associate matter, Plaintiff's workplace communications with other attorneys, and alleged concerns regarding Plaintiff's responsiveness to and communications with clients.

150. Before terminating Plaintiff, Defendant had not placed him on a performance improvement plan, issued him a written disciplinary warning, or raised with him any concerns from clients or attorneys concerning the conduct on which it later relied.

151. Defendant had not previously issued Plaintiff a written disciplinary warning concerning the conduct on which it relied to terminate him.

152. Defendant’s stated reason of "unprofessional communications with colleagues" relied on email correspondence that Defendant never identified to Plaintiff. As to the only email Plaintiff had identified, a nine-month-old email exchange with a New York partner

involving a misunderstanding that Plaintiff had promptly addressed and clarified, Defendant admitted in its termination correspondence:

*"We did not find or review that email."*

153. Defendant never identified to Plaintiff the other correspondence it claims to have reviewed and never gave Plaintiff an opportunity to address it before terminating his employment.

*Defendant's Reasons for Termination Were Pretextual and Retaliatory*

154. Defendant terminated Plaintiff shortly after he repeatedly complained that Defendant had failed to effectively accommodate his hearing disability.

155. Plaintiff's complaints were escalated directly to Ms. Paul.

156. After Plaintiff challenged Defendant's handling of his accommodation, Ms. Paul became personally involved in the dispute and treated Plaintiff in an increasingly adversarial manner.

157. Ms. Paul thereafter accused Plaintiff in writing of making a report concerning his accommodation equipment that was "*not credible.*"

158. Defendant subsequently could not locate the equipment Plaintiff said he had never received and ordered replacement equipment.

159. Ms. Paul never withdrew her attack on Plaintiff's credibility.

160. Weeks later, Ms. Paul became centrally involved in the investigation of Plaintiff's conduct.

161. During that investigation, Ms. Paul again questioned Plaintiff's credibility by suggesting that messages were missing from the communications he produced.

162. Plaintiff asked Ms. Paul to identify the supposedly missing information and offered a means by which Defendant could obtain any additional communications directly from the summer associate.

163. Plaintiff continued to provide information and to request an opportunity to respond to Defendant's concerns.

164. Defendant nevertheless terminated Plaintiff.

165. Ms. Paul participated directly in the termination process.

166. Defendant terminated Plaintiff despite his documented productivity, substantial billable hours, revenue generation, client development, and absence of prior formal discipline.

167. Defendant also advertised a Sarasota healthcare/corporate attorney position before informing Plaintiff that his employment would be terminated.

168. The sequencing and timing of, and close temporal relationship between, Plaintiff's repeated accommodation complaints, Ms. Paul's subsequent treatment of Plaintiff, her role in the investigation, and Defendant's termination decision support Plaintiff's allegation that Defendant's stated reasons for termination were pretextual.

169. Defendant's stated reasons were used to conceal Defendant's unlawful discrimination and retaliation against Plaintiff because of his disability, his requests for reasonable accommodation, and his complaints concerning Defendant's failure to effectively accommodate him.

*Plaintiff's Origination and Compensation Dispute*

170. Separately, on or about April 2024, Partner Doug Hibshman brought Plaintiff onto a small matter involving the potential establishment of a Florida Direct Primary Care Clinic for a corporate client.

171. In June 2024, Plaintiff and Mr. Hibshman were subsequently advised that the original project would not move forward.

172. During that time, Plaintiff held one-on-one discussions with client's Executive team, regarding its healthcare business and proposed a materially different project centered upon the development of a Direct-to-Consumer Telehealth corporate structure.

173. Plaintiff prepared a presentation on the proposed structure and engagement, and the client agreed to proceed with additional workstreams.

174. Plaintiff performed substantial work on the resulting matters, including work concerning a Private Membership Association ("PMA").

175. Around August 2024, the client engagement expanded to include additional workstreams.

176. Plaintiff communicated with Mr. Hibshman about the staffing and support needed for the additional matters.

177. In late August 2024, when the additional matters were being opened, Mr. Hibshman's client service specialist ("CSS") asked who would be identified as the submitting attorney.

178. Mr. Hibshman responded: *"Both of us."*

179. Plaintiff was the primary point of contact and thereafter continued performing substantial work for the client.

180. In December 2024, Plaintiff met with Mr. Hibshman regarding Plaintiff's earlier request that Mr. Hibshman confirm a 50/50 split of the origination credit for the new matters.

181. A dispute subsequently arose between Plaintiff and Mr. Hibshman regarding Plaintiff's entitlement to origination credit.

182. On January 15, 2025, Plaintiff formally raised the origination-credit dispute with Firmwide Managing Partner Todd Rodriguez.

183. Plaintiff referenced Defendant's Fee Credit Sharing Policy and requested that Mr. Rodriguez resolve the dispute concerning how he and Mr. Hibshman would split the origination credit on the new client engagements.

184. Defendant's Fee Credit Sharing Policy provides that "a significant factor in determining whether credit will be shared . . . is the likelihood of whether the originating attorney would have obtained the work without regard to (a) who is actually assigned or requested to perform the work or (b) any pre-existing relationship."

185. In that contemporaneous email, Plaintiff advised Mr. Rodriguez that he accounted for approximately $360,000 of approximately $500,000 collected from the new matters.

186. Plaintiff further advised Mr. Rodriguez that the new projects resulted from Plaintiff's sole and direct efforts, including the project structure he had developed and pitched to the client without Mr. Hibshman's involvement.

187. Plaintiff explained that he had developed a substantial working relationship with the client's CEO and had invested considerable time over several months servicing the client's requests.

188. Plaintiff continued to follow up regarding the origination dispute in the following months.

189. On May 21, 2025, Plaintiff again contacted Mr. Rodriguez regarding the unresolved origination-credit dispute and his merit-based compensation.

190. Plaintiff advised Mr. Rodriguez that he had attempted to raise the origination dispute approximately three times and still had not been afforded an opportunity to fully present his position.

191. Plaintiff requested a meeting with Mr. Rodriguez concerning his compensation, origination credit, and advancement at Defendant.

192. The origination-credit dispute remained unresolved when Defendant terminated Plaintiff.

193. On the morning of September 3, 2025, before Plaintiff received Defendant's formal written termination letter, Mr. Hibshman informed the corporate client whose matters were the subject of the origination-credit dispute that Plaintiff was no longer with Defendant.

*Plaintiff's Damages*

194. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, benefits, compensation, origination compensation, professional opportunities, and other economic damages.

195. Plaintiff also suffered emotional distress, humiliation, inconvenience, loss of professional opportunity, and other damages as a result of Defendant's unlawful conduct.

## CLAIMS FOR RELIEF

## COUNT I
## AMERICANS WITH DISABILITIES ACT – DISABILITY DISCRIMINATION
## 42 U.S.C. § 12112(a)

196. Plaintiff realleges and incorporates by reference Paragraphs 20 through 29, 30 through 64, and 137 through 169 as though fully set forth herein.

197. Plaintiff is an individual with a disability within the meaning of the ADA because his hearing impairment substantially limits the major life activity of hearing. (¶ 32.)

198. Plaintiff was qualified to perform the essential functions of his position, as demonstrated by his substantial billable hours, revenue generation, client development, and performance record. (¶¶ 20–29.)

199. Defendant knew of Plaintiff's disability. (¶¶ 31–57.)

200. Defendant terminated Plaintiff's employment effective September 5, 2025. (¶¶ 143–153.)

201. The circumstances surrounding Plaintiff's termination, including Ms. Paul's involvement in Plaintiff's disability-accommodation dispute and subsequent investigation, Defendant's pre-termination Sarasota job posting, and Defendant's reliance upon disputed and unreviewed matters, support a reasonable inference that Plaintiff's disability was a determinative factor in Defendant's decision. (¶¶ 58–66, 91–169.)

202. But for Plaintiff's disability, Defendant would not have terminated his employment.

203. Defendant thereby discriminated against Plaintiff because of his disability in violation of the ADA.

204. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful discrimination. (¶¶ 194–195.)

**COUNT II**
**AMERICANS WITH DISABILITIES ACT – FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
**42 U.S.C. § 12112(a), (b)(5)(A)**

205. Plaintiff realleges and incorporates by reference Paragraphs 30 through 91 as though fully set forth herein.

206. Plaintiff is a qualified individual with a disability whose hearing impairment affected his ability to perform essential workplace communications. (¶ 32.)

207. Defendant knew of Plaintiff's disability and need for reasonable accommodation. (¶¶ 31–57.)

208. Plaintiff repeatedly requested reasonable accommodation, provided information concerning his disability-related limitations, and advised Defendant that the devices it provided were ineffective. (¶¶ 31–57.)

209. Defendant denied Plaintiff's request for hearing aids and failed to timely provide another effective reasonable accommodation despite Plaintiff's repeated requests and continued participation in the accommodation process. (¶¶ 50–66, 71–92.)

210. Defendant did not establish that providing Plaintiff with an effective reasonable accommodation would have imposed an undue hardship.

211. Defendant thereby failed to reasonably accommodate Plaintiff's known disability in violation of the ADA.

212. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful conduct.

**COUNT III**
**AMERICANS WITH DISABILITIES ACT – RETALIATION**
**42 U.S.C. § 12203(a)**

213. Plaintiff realleges and incorporates by reference Paragraphs 41 through 168 as though fully set forth herein.

214. Plaintiff engaged in activity protected by the ADA by repeatedly requesting reasonable accommodation and opposing Defendant's denial and handling of his accommodation requests. (¶¶ 43–65.)

215. Defendant, including Chief Human Resources Officer Julie Paul, had actual knowledge of Plaintiff's protected activity. (¶¶ 58 –65.)

216. Following Plaintiff's protected activity, Ms. Paul questioned Plaintiff's credibility during the accommodation dispute and thereafter became centrally involved in Defendant's investigation of Plaintiff. (¶¶ 67–154.)

217. While the investigation remained pending, Defendant advertised a Sarasota Corporate/Health Care Regulatory position before informing Plaintiff that his employment would be terminated. (¶¶ 138–142.)

218. Ms. Paul thereafter participated directly in the meeting at which Defendant terminated Plaintiff, and Defendant relied upon disputed matters and correspondence it never identified to Plaintiff, while admitting that it "did not find or review" the only correspondence that he himself had disclosed. (¶¶ 143–153.)

219. The timing and sequence of events, Ms. Paul's involvement in both Plaintiff's protected accommodation activity and the investigation preceding his termination, and the circumstances surrounding Defendant's stated reasons support a reasonable inference that Plaintiff's protected activity caused his termination. (¶¶ 154–169.)

220. But for Plaintiff's protected activity, Defendant would not have subjected Plaintiff to the materially adverse treatment culminating in his termination.

221. Defendant thereby retaliated against Plaintiff in violation of the ADA.

222. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful retaliation. (¶¶ 194–195.)

**COUNT IV**
**FLORIDA CIVIL RIGHTS ACT – DISABILITY DISCRIMINATION**
**FLA. STAT. § 760.10(1)**

223. Plaintiff realleges and incorporates by reference Paragraphs 20 through 65 and 138 through 169 as though fully set forth herein.

224. Plaintiff has a disability or handicap protected under the FCRA because of his hearing impairment. (¶ 32.)

225. Plaintiff was qualified to perform the essential functions of his position, as demonstrated by his performance, substantial billable hours, revenue generation, and client development. (¶¶ 20–31.)

226. Defendant knew of Plaintiff's disability. (¶¶ 32–57.)

227. Defendant terminated Plaintiff's employment effective September 5, 2025. (¶¶ 143–153.)

228. The circumstances surrounding Plaintiff's termination support a reasonable inference that his disability or handicap was a determinative factor in Defendant's decision. (¶¶ 58–66, 91–169.)

229. But for Plaintiff's disability or handicap, Defendant would not have terminated his employment.

230. Defendant thereby discriminated against Plaintiff in violation of Fla. Stat. § 760.10(1)(a).

231. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful discrimination. (¶¶ 194–195.)

## COUNT V
## FLORIDA CIVIL RIGHTS ACT – FAILURE TO PROVIDE REASONABLE ACCOMMODATION
## FLA. STAT. § 760.10(1)

232. Plaintiff realleges and incorporates by reference Paragraphs 32 through 93 as though fully set forth herein.

233. Plaintiff is a qualified individual with a disability or handicap protected under the FCRA. (¶ 32.)

234. Defendant knew of Plaintiff's disability and need for reasonable accommodation. (¶¶ 32–57.)

235. Plaintiff repeatedly requested reasonable accommodation and advised Defendant that the devices provided were ineffective in addressing his disability-related limitations. (¶¶ 32–57.)

236. Defendant denied Plaintiff's request for hearing aids and failed to timely provide another effective reasonable accommodation despite Plaintiff's continued participation in the accommodation process. (¶¶ 50–65, 71–92.)

237. Defendant did not establish that providing Plaintiff with an effective reasonable accommodation would have imposed an undue hardship.

238. Defendant thereby failed to reasonably accommodate Plaintiff's disability or handicap in violation of the FCRA.

239. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful conduct.

**COUNT VI**
**FLORIDA CIVIL RIGHTS ACT – RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION**
**FLA. STAT. § 760.10(7)**

240. Plaintiff realleges and incorporates by reference Paragraphs 43 through 169 as though fully set forth herein.

241. Plaintiff engaged in protected activity by opposing Defendant's denial and handling of his disability accommodation and complaining that Defendant had failed to provide an effective accommodation. (¶¶ 43–65.)

242. Defendant, including Ms. Paul, had actual knowledge of Plaintiff's protected activity. (¶¶ 58–65.)

243. Following Plaintiff's protected activity, Ms. Paul questioned Plaintiff's credibility during the accommodation dispute and thereafter became centrally involved in Defendant's investigation of Plaintiff. (¶¶ 67–137.)

244. While the investigation remained pending, Defendant advertised a Sarasota Corporate/Health Care Regulatory position before informing Plaintiff that his employment would be terminated. (¶¶ 138–142.)

245. Ms. Paul thereafter participated directly in the meeting at which Defendant terminated Plaintiff, and Defendant relied upon disputed matters and an alleged communication it acknowledged it "did not find or review." (¶¶ 143–153.)

246. The timing and sequence of events, Ms. Paul's intervening conduct, and the circumstances surrounding Defendant's stated reasons support a reasonable inference that Plaintiff's protected activity caused his termination. (¶¶ 154–169.)

247. But for Plaintiff's protected activity, Defendant would not have subjected Plaintiff to the materially adverse treatment culminating in his termination.

248. Defendant thereby retaliated against Plaintiff in violation of Fla. Stat. § 760.10(7).

249. Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful retaliation. (¶¶ 194–195.)

**COUNT VII**
**UNJUST ENRICHMENT – UNPAID ORIGINATION COMPENSATION**

250. Plaintiff realleges and incorporates by reference Paragraphs 170 through 193 as though fully set forth herein.

251. Plaintiff conferred a direct benefit upon Defendant by originating and developing new client matters that generated substantial revenue and collections for Defendant. (¶¶ 170–191.)

252. Defendant knew of, accepted, and retained the benefit of Plaintiff's origination efforts and the resulting revenue. (¶¶ 170–192.)

253. Defendant knew that Plaintiff claimed origination credit for that business pursuant to Defendant's Fee Credit Sharing Policy, and that origination credit under that Policy was a determinant of Plaintiff's compensation and advancement at Defendant. (¶¶ 180–192.)

254. Defendant nevertheless retained the benefit of Plaintiff's origination efforts and resulting revenue without according Plaintiff the origination credit and the compensation attributable to that credit, to which he was entitled under Defendant's Fee Credit Sharing Policy.

255. Under these circumstances, it would be inequitable for Defendant to retain the benefit without paying Plaintiff the compensation attributable to Plaintiff's origination efforts.

256. Plaintiff is entitled to restitution for the value of the benefit unjustly retained by Defendant, in an amount to be established through Defendant's origination, billing, collection, and compensation records.

257. Plaintiff's earned and unpaid origination compensation constitutes wages for purposes of Fla. Stat. § 448.08, and Plaintiff seeks his reasonable attorneys' fees and costs incurred in recovering those wages.

## PRAYER OF RELIEF

**ACCORDINGLY,** Plaintiff Yazen Dides prays for the following damages or relief against Fox Rothschild LLP:

A. Declare that Defendant violated the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA") by discriminating against Plaintiff because of his disability, failing to provide a reasonable accommodation, and retaliating against Plaintiff for engaging in protected activity;

B. Award Plaintiff all back pay and other economic damages, including lost wages, bonuses, benefits, retirement contributions, and other compensation and benefits Plaintiff would have received but for Defendant's unlawful conduct;

C. Award Plaintiff front pay and future lost compensation and benefits in lieu of reinstatement;

D. Award Plaintiff restitution for the value of the benefit unjustly retained by Defendant, including unpaid origination compensation and commissions, in an amount to be determined at trial;

E. Award Plaintiff compensatory damages for emotional distress, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses to the fullest extent permitted by law;

F. Award Plaintiff punitive damages based upon Defendant's malice and/or reckless indifference to Plaintiff's federally and state-protected rights, to the fullest extent permitted by law;

G. Award Plaintiff prejudgment and post-judgment interest on all amounts recoverable by law;

H. Award Plaintiff reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 12205, Fla. Stat. §§ 760.11(5) and 448.08, and other applicable law;

I. Grant Plaintiff all appropriate declaratory and equitable relief necessary to remedy Defendant's unlawful discrimination and retaliation; and

J. Grant such other and further legal and equitable relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

**WHEREFORE**, Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

RESPECTFULLY SUBMITTED on September 8th, 2026

/s/ Daniela Carrión
**Daniela Carrion, Esq.**
Fla. Bar No.: 125366
laborlaw@lineschfirm.com
LINESCH & CARRIÓN PA
700 Bee Pond Road
Palm Harbor, FL 34683
(727) 786-0000
(727) 786-0974 (FAX)
Attorney for Plaintiff
daniela.carrion@lineschfirm.com